**MAVERICK v. PEREZ et al.  (No. 176–3202.)**

(Commission of Appeals of Texas, Section B.
March 2, 1921.)

**1. Vendor and purchaser ⊕═89—Suit to forfeit for nonpayment of balance of price governed by equitable rules.**

A vendor's suit against vendee in possession to cancel the deed and rescind the contract of sale is cognizable only in equity, and it must appear therein that the right to rescind existed when suit was brought, that it was not inequitable to permit the exercise of that right, and that plaintiff was offering to do equity.

**2. Vendor and purchaser ⊕═89—Right to rescind and recover property must appear in contract.**

The rights of the vendor of real estate in property conveyed under executory contract are measured by the terms of the contract, and the right to rescind and recover the property upon the strength of the vendor's so-called superior title is but an alternative remedy which the vendor has under the contract of sale.

**3. Vendor and purchaser ⊕═95(1) — Vendor's right of rescission may be lost or waived.**

The vendor's right of rescission of an executory contract is by no means an absolute one, and may be lost or waived in a number of ways; and when lost it will not be revived unless to do so is necessary to protect the vendor against a successful repudiation by the vendee of the unsatisfied obligations of the contract under which he holds.

**4. Vendor and purchaser ⊕═95(2)—Vendor's right to forfeit contract held waived.**

The vendor's right to cancel deed to defendant vendees and to forfeit land contract for nonpayment of balance due was lost or waived where it appeared that all but $70 or less of the total consideration of $700 had been paid; that the balance was past due since 1881; that plaintiff vendor had accepted repeated payments since that date, and had continued to demand payment of the balance up to the year 1888; that from that time until 1914 no action was taken by plaintiff, during which period defendants had expended $2,500 in improving the property and the value of the land without improvements had enhanced to over $5,000; especially in view of evidence that vendees, instead of repudiating the debt, professed a willingness to pay it if they could raise the money and even offered to execute a mortgage upon the property to secure it.

**5. Vendor and purchaser ⊕═98—Repayment of purchase money condition of vendor's rescission.**

For the vendor to invoke the aid of equity to cancel his deed to the vendee and rescind the contract of sale for nonpayment of the balance of the purchase price, the vendor must, especially where a large part of the purchase money has been paid, offer to pay back the purchase money and place the vendee, or those claiming under him, in statu quo.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by W. H. Maverick against Alejo E. Perez and others. Judgment for plaintiff was reversed and the cause remanded by the Court of Civil Appeals (202 S. W. 199), and plaintiff brings error. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered that plaintiff take nothing.

Templeton, Brooks, Napier & Ogden, of San Antonio, for plaintiff in error.

W. W. King, of San Antonio, for defendants in error.

McCLENDON, P. J. This suit was brought by W. H. Maverick against Alejo E. Perez and several others, to cancel a deed to 140 acres of land in Bexar county, and recover back the property, upon the ground that a part of the consideration for the deed, secured by expressly reserved vendor's lien, had not been paid, and plaintiff had exercised his right to rescind the contract of sale and recover upon his superior title. The cause was tried before a jury upon special issues, and judgment was rendered upon the findings of the jury in favor of the plaintiff for the land sued for. The Court of Civil Appeals sustained an assignment of error complaining of the admission of certain testimony by the trial court, reversed the trial court's judgment, and remanded the cause for a new trial. 202 S. W. 199.

The controlling issue in the case is whether under any view of the evidence plaintiff presented a cause of action for rescission of the deed and recovery of the land. The following statement of the pleadings and evidence will suffice to a clear understanding of this issue:

Plaintiff alleged that on February 23, 1880, he conveyed the land to Juana Navarro y Alsbury, deceased, for the sum of $700, evidenced by note due on or before one year after date, the note and deed reserving a vendor's lien to secure the purchase-money obligation; that the grantee and those claiming under her had failed and refused to pay the note in full, and therefore plaintiff had exercised his right and option to cancel the deed and rescind the sale; that by reason of such failure to pay and such exercise by plaintiff of his option to rescind, he was entitled to the possession of the premises and have the deed canceled and held for naught. His prayer was for a cancellation of the deed and a judgment for title and possession of the premises, and for damages and costs.

The defendants, besides a general demurrer and special exception, the latter interposing against a recovery of the property the bar of the statutes of limitation of three, four, five, and ten years, urged a general denial, plea of not guilty, and special pleas of payment of the purchase-money note and of good-faith improvements upon the property amounting

to $2,465; and prayed to recover the value of their improvements, should judgment be rendered for plaintiff for the land.

There were three special issues submitted to the jury, the findings under which were: First, that the note had not been paid in full; second, that the amount "still owing on account of said note" was $86.40; and, third, that at the time the improvements were made defendants did not believe that the purchase money had been paid in full.

Plaintiff was conceded to be common source of title. The evidence showed the conveyance of the property, execution of the $700 note, and retention of the vendor's lien as pleaded. The note bore 12 per cent. interest per annum from date. It was in the possession of plaintiff, and bore indorsements of credits as follows: February 23, 1880, $575; May 9, 1882, $15 on principal and $33.75 "interest to May 23/82"; and November 12, 1886, $61, "interest to date and forty dollars ($40) part principal, leaving due seventy dollars ($70)."

The date of the death of the original grantee is not shown, but both sides introduced deeds as follows: Deed from the original grantee to A. G., and Oswaldo Perez, October 27, 1882; deed from A. G., and Oswaldo Perez to Alejo E. Perez, November 18, 1885; deed from Alejo E. Perez to Alfred S. Perez, April 2, 1901; deed from Alfred S. Perez to Alejo E. Perez, Sr., March 26, 1908, conveying to the latter a life estate in the property.

Juana Navarro y Alsbury went into possession of the property immediately upon conveyance to her in 1880, and she and those claiming under her had continuous possession and paid the taxes thereon up to the date of the trial. The improvements pleaded by defendants and their value at $2,510 were proved up without controversy. Several letters were addressed to Alejo E. Perez by the plaintiff, or his agent, prior to the date of the last credit, calling on him to pay taxes for which the property was advertised, and demanding payment of the balance of the purchase money.

On April 23, 1888, Alfred Maverick, as attorney for plaintiff, wrote to Alejo E. Perez, reminding him that $70 was still due upon the principal of the note, and asking him to call at his office and settle the account "at his earliest convenience," and also asking him to pay the taxes for which the property was then advertised for sale. From the date of that letter up to August, 1914, no demand was ever made upon any of the defendants, either for payment of the balance upon the note or for restitution of the premises. Plaintiff explained his conduct in this regard as follows:

"The reason I let it rock along was I didn't suppose he could do anything with the land without clearing it off."

And he brought suit because of the 1913 statute of limitations.

Between August, 1914, and about one week prior to November 16, 1914, the date suit was filed, negotiations looking towards an adjustment of the balance claimed upon the note were conducted between plaintiff and his son, Louis Maverick, on the one hand, and Alejo E. Perez and his attorney, on the other. Just what was said by the participants in the several conferences which took place during this period is a matter of some conflict in the testimony. The version of Perez and his attorney is that the Mavericks were demanding the full amount, principal and interest, claimed to be due, or at least not less than $350 of that amount; Perez claiming that he thought the amount had been paid by his mother, and that if plaintiff had told him there was anything due after the death of his mother, he would have settled it long ago, and expressing a willingness to pay up if he could raise the money, or if the amount demanded were scaled to a sum which he could raise. Plaintiff testified that in these conversations Perez admitted that the money was owing, and said he would try to borrow it and pay it. It appears from the testimony of Louis Maverick that he had for about two years prior to 1914 been endeavoring to induce his father to let him collect the debt, but the latter did not accede to this request until August, 1914; that between that date and about a week before the trial, he wrote four letters to Perez demanding payment, and had two conferences with him. His version of the first conference is given in the following language:

"When Mr. Perez came the first time he came with his son and Mr. Wilkins. He came in and said he had received the letter and that he wanted to adjust the matter, that the matter had been running along a long time and had been on his mind and he wanted to finally adjust and whether we would take less than he owed us, and knowing the disposition of the Mexican race, to dicker and banter about always paying a little less than what they really owe, I insisted that he would have to pay the entire sum, and he left the office saying that he would try and make arrangements to pay the money. He never has denied owing it to me; I have talked to him personally twice. Yes, sir; he at that conversation told me that he would see if he could go out and raise the money."

He testifies that the next conference was with Perez's attorney, who endeavored to get the amount scaled to $250, which witness declined. The last conference with Perez, which was after the last letter, the witness described as follows:

"He said that the matter had been on his mind, but the trouble was he had never been able to rustle up enough money to pay his taxes and other little expenses and improvements and also meet this obligation, and he

figured that it would rock along and some day he would do it, his sons and they would pay it. He said he was trying to get the money then to pay it and that he had spoken to Mr. Rubiola and asked him to loan him money, and I think he mentioned Mr. Andres Coy. Anyhow, he told he me had spoken to some one or two or three persons to get this money to pay this note and he wanted to know then if we would knock some of it off and I told him I certainly would. We didn't want to be hard on him, but what we wanted to get was to get this money paid, this note paid and settled, that he had plenty of time, and I told him then that it was getting pretty close to the expiration of the time in which suit had to be filed and that we could possibly wait on him one more week, and at the expiration of the week ,I believe I went to your office and asked you to file this suit. And Mr. Perez also stated that he would give us a mortgage on this land to pay this sum of money, and I told him that I didn't know how the title of the land was, that I understood it was mixed up with some heirs and I wasn't satisfied that he himself could give us a mortgage on it, on the land without everybody executing it, and that it would not be satisfactory, and the only way we could do would be to file the suit, and then if he wanted to come in and pay the money we could dismiss the suit."

Perez, the only witness on the subject, testified that the land was worth only $1.50 an acre at the time of purchase in 1880. The only testimony upon value at the time of trial was that of Perez and his son, who fixed the value respectively at $35 and $50 an acre.

[1] The doctrine announced in those cases which hold the vendee estopped to deny the superior title of the vendor, where the former has repudiated the contract of sale by successfully interposing the bar of limitation to the enforcement of the purchase money obligation, has no application to the case presented by this record. Plaintiff's suit, both in form and substance, was an action to cancel the deed and rescind the contract of sale —an action, under repeated holdings of our Supreme Court, cognizable only in equity, in which it must appear that the right to rescind existed at the time the action was brought; that it was not inequitable to permit the exercise of that right; and that plaintiff was offering to do equity. Thomas v. Beaton, 25 Tex. Supp. 318; Von Roader v. Robson, 20 Tex. 754; Younger v. Welch, 22 Tex. 418; McCarty v. Moorer, 50 Tex. 287; Coddington v. Wells, 59 Tex. 49; Tom v. Wollhoefer, 61 Tex. 277; Moore v. Giesecke, 76 Tex. 543, 13 S. W. 290.

[2, 3] The rights of the vendor of real estate in property conveyed under executory contract are measured by the terms of the contract, and the right to rescind and recover the property upon the strength of the vendor's so-called superior title, is but an alternative remedy which the vendor has under the contract of sale. Carey v. Starr, 93 Tex. 508, 56 S. W. 324; Douglass v. Blount, 95 Tex. 369, 67 S. W. 484, 58 L. R. A. 699. This right of rescission is by no means an absolute one, and may be lost or waived in a number of ways; and when lost it will not be revived unless to do so is necessary to protect the vendor against a successful repudiation by the vendee of the unsatisfied obligations of the contract under which he holds.

The principles announced in the following quotations from Tom v. Wollhoefer, above, control, we think, the proper disposition of this case:

"The vendor's remedy by rescission is a harsh and stringent one, especially when a part of the consideration has been paid, and it is sought to forfeit the payment and recover or resell the land. Hence slight circumstances are seized upon to protect the vendee against the forfeiture of the amount paid, or compel the vendor to seek redress by a suit for the balance due upon the purchase money.

"He must not delay too long in insisting upon payment of the money as it falls due, or he will be considered as having waived the default. * * * He must not treat the contract as still subsisting, or do any act which may be construed into its affirmance. * * *

"If the vendor goes into equity to set aside the sale he must tender the purchase money already received or he will be defeated as not offering to do equity. Coddington v. Wells, [59 Tex. 49]; Thomas v. Beaton, 25 Tex. Supp. 321."

These principles have been repeatedly reiterated and followed in this state, and we deem it unnecessary to multiply citations which support them.

[4] The undisputed facts show beyond question that at the time the suit was instituted the right of rescission had been lost; and, if capable of being revived, this clearly could not be done except as a last resort to enforce performance of the contract. The fact that all but $70 or less of the total consideration of $700 had been paid; that the balance, if any, was past due since February, 1881; that plaintiff had accepted repeated payments since that date, and had continued to demand payment of the balance up to the year 1888; that from that time until 1914 no action was taken by plaintiff in any way indicating that he intended to exercise his right of rescission, if it existed; and that during this period defendants had expended $2,500 in improvements upon the property, and the value of the land without improvements had enhanced to over $5,000— conclusively establish a waiver and loss of the right of rescission. No circumstances are in evidence in any way tending to support a finding that, if the right of rescission was subject to be revived, such revival had taken place. No effort to enforce the payment of the purchase money by suit was made, and clearly if suit had been brought for the alleged balance of purchase money,

defendants would have had the right to contest the action upon the ground of payment, without jeopardizing either their title to the property or their right to discharge any part of the debt judicially determined to be unpaid. The mere fact that defendants did not pay the claim, when presented, would not amount to such repudiation of the contract of sale as would authorize a rescission. Especially is this so in view of the . circumstances surrounding the transaction, the conduct of the grantor, and the long lapse of time since the maturity of the debt. If plaintiff's version of the negotiations immediately preceding the suit is correct, then, instead of a repudiation of the debt, Alejo E. Perez, the only defendant of whom any demand was ever made, acknowledged its justness, professed a willingness to pay if he could raise the money, and even offered to execute a mortgage upon the property to secure it. It would be a doctrine entirely foreign to our conception of equitable principles which would hold that the harsh right of rescission, which had been lost for a period of nearly thirty years, was revived by a mere failure to pay a comparatively trivial balance of purchase money admitted to be owing.

[5] The further doctrine is announced in the above cases that in an action of this character, especially where a large part of the purchase money has been paid, the grantor must, in order to invoke the aid of a court of equity to cancel a deed and rescind a contract of sale, offer to pay back the purchase money and place the vendee, or those claiming under him, in statu quo. The evidence negatives any offer or willingness on plaintiff's part to comply with this prerequisite. We doubt whether the adjudicated cases present a state of facts demanding more strongly than does the present case an application of the maxim that "He who seeks equity must do equity."

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed, and judgment rendered that the plaintiff take nothing by his suit.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.