216 So.2d 702 (1968)
VAVOLINE OIL COMPANY, Plaintiff and Appellant,
v.
CONCORDIA PARISH SCHOOL BOARD et al., Defendants and Appellees.
No. 2460.
Court of Appeal of Louisiana, Third Circuit.
December 5, 1968.
Rehearing Denied January 10, 1969.
*703 William L. Koerber, Vidalia, Smith, Taliaferro & Griffing, by George Griffing, Jonesville, for plaintiff-appellant.
Falkenheiner & Calhoun, by W. C. Falkenheiner, Vidalia, Bienvenu & Culver, by Ernest O'Bannon, New Orleans, Gaharan & Richey, by L. W. Richey, Jena, John L. Madden, Asst. Atty. Gen., Baton Rouge, for defendants-appellees.
Before TATE, CULPEPPER and HOOD, JJ.
CULPEPPER, Judge.
The plaintiff, Vavoline Oil Company, filed this concursus proceeding[1] to determine conflicting claims to certain royalty paid under oil, gas and mineral leases. Impleaded as conflicting claimants are: (1) the Concordia Parish School Board,[2] and (2) F. Nock LeMeunier, Jr., et al., hereinafter referred to as the private claimants. The district judge decided the land, whose title is at issue, is owned by the state as trustee for the benefit of the Concordia Parish Schools. The private claimants appealed.
The land at issue is Section 16, T3NR8E, Concordia Parish, Louisiana, an irregular section containing 128.5 acres. 4.16 acres of the section are in the production unit from which the royalties are being paid. It is uninhabited woodland in a swamp area and unaccessible by any improved road.
*704 The substantial issues are: (1) the validity of a patent to this land by the State of Louisiana; (2) if the patent is valid, the legality of a tax sale on which the private claimants base their title; and (3) if the patent is valid, has the Concordia Parish School Board acquired title by acquisitive prescription of 30 years?
There is little, if any, dispute as to the facts. We will give them substantially as set forth in the State's brief.
Township 3 North, Range 8 East was surveyed by a Deputy U. S. Surveyor in the fall and winter of 1823 and 1824, and an official township plat of said township was prepared from said survey. This plat reveals that the township is not a regular township and consists of 53 sections, only five of which are regular in size and shape, and the balance are irregularly shaped sections, including Section 16, which is shown on this plat. There is no Lot 16 designated on this plat. (School Board Exhibit No. 1)
On June 12, 1832, Indemnity List No. 2, Ouachita District, indicates that the United States conveyed to the State of Louisiana as School Indemnity Lands a Lot or Section 16, Township 3 North, Range 8 East (School Board Exhibits Nos. 2 and 3).
On August 20, 1861, a Patent No. 10,365 was issued out of the Louisiana Land Office to Charles D. Hamilton (assign of John Laidlaw). Neither the original of this patent, nor a copy thereof, is in the record of the present case. An unsigned certificate of the "Louisiana Land Office" shows the Patent Number, the date, and the name of the patentee. It then gives the description of the property as follows:
 DESCRIPTION OF THE LAND PATENTED.
PARTS OF
SECTIONS. SECTION. TOWNSHIP. RANGE. QUANTITY. DISTRICT
 Lot No. 16 3 N. 8 E. 128.50 N.R.R.
Certificate, No. 8922 N.S.H.
 "Swamp"
The property was never assessed in Concordia Parish in either the name of John Laidlaw or Charles D. Hamilton until an assessment of 1896 in the name of John Laidlaw. (Testimony of Witness W. A. Beard, Transcript, p. 24).
On May 29, 1897, Mrs. Ida Nock LeMeunier, separate in property from her husband, purchased Section 16, Township 3 North, Range 8 East, at a tax sale for unpaid taxes for the years 1894, 1895 and 1896 assessed to John Laidlaw.
The records further show that on July 17, 1897 the taxes for 1896 were paid. This payment was subsequent to the date of the tax sale to Mrs. LeMeunier on May 29, 1897 and also after the tax sale deed was recorded in COB V, page 61, Records of Concordia Parish, Louisiana on July 7, 1897. (Witness W. A. Beard, Transcript, pp. 33 and 34).
There was no other assessment of the property except for an assessment in the year 1903 in the name of Mrs. Ida Nock LeMeunier, which said assessment was cancelled with the notation "erroneous assessment, school land". (Witness W. A. Beard, Transcript, p. 34).
On July 12, 1917, the then Register of the State Land Office cancelled Patent No. 10,365, and executed cancellations on all documents indicating that such patent had been issued, and issued in lieu thereof Warrant No. 157. (School Board Exhibit No. 5).
On October 2, 1912, the widow and heirs of John Laidlaw, deceased, sold to Alvin *705 R. Albritton all of their right, title and interest in any State land warrants issued to John Laidlaw, including the Warrant or Certificate No. 8922, covering Lot 16 of Township 3 North, Range 8 East, and Warrant No. 157, which was issued in lieu of Patent No. 10,365; that the said Warrant No. 157 was fully satisfied by Patent No. 10,641 issued to Alvin R. Albritton covering other lands owned by the State of Louisiana and located outside the Parish of Concordia.
None of the private claimants herein have ever had any possession whatsoever of the land, none of them were aware of its existence prior to their execution of leases in the fall of 1966 when contacted by the representatives of Placid Oil Company, nor were they aware of any possession by their ancestors. (Transcript, pp. 19 and 20).
The property has been under fence since 1964 or 1965 and is in possession of the Concordia Parish School Board, which has maintained records on the property for in excess of sixty years, and has executed oil, gas and mineral leases thereon, the first of which was in 1929. The property is woodland and is located in a sparsely settled area. (Testimony of Witnesses Young, Cage and Alwood, and School Board Exhibit Nos. 10 and 11).
After publication and due notice, including notice in public minutes of the School Board, the School Board executed an oil, gas and mineral lease on the property on August 31, 1964 to Justiss-Mears Oil Company, Inc. Over two years later, in October and December of 1966, the LeMeunier heirs executed oil, gas and mineral leases to Placid Oil Company. (School Board Exhibit No. 12).
Also, the Concordia Parish School Board had, after due notice and advertisement, executed a timber sale on the property to Rogers Brothers Lumber Company on 30 November 1965, and said lumber company, pursuant to said deed, did thereafter enter upon the land and cut and remove the timber from it. (School Board Exhibit No. 13).
No adverse claim to the property was ever asserted against Concordia Parish School Board until the filing of this concursus proceeding. (Transcript, p. 3).
The first issue is the validity of the patent, for if the patent is of no effect the property is owned by the State of Louisiana in trust for the School Board. One of the questions discussed by counsel is whether this land was acquired by the State of Louisiana in the same manner as regular Section 16 lands in each township or whether the property was acquired by the State as school indemnity lands, in lieu of sixteenth section lands because there was no regular Section 16 in this township.[3] The private claimants take the position that this was school indemnity land and under Act 316 of 1855[4] it was properly sold and patented by the state. They contend the provisions of Act 316 of 1855, requiring an *706 election of the voters in the township, applied only to regular Section 16 lands and did not apply to school indemnity lands, such as those involved here. The State contends that Act 321 of 1855 was the only statute in existence relative to the sale of public school lands at the time this property was sold and patented in 1861; and that there was no compliance with this statute, hence the patent was illegally issued.[5]
We pretermit these questions regarding Act 321 of 1855. It is conceded by both the State and the private claimants that the State had authority to sell and to patent public school lands. These lands were acually sold and a patent issued. The jurisprudence of this state is established that patents, valid on their face, are presumed valid until revoked by a judgment of court in judicial proceedings instituted for that purpose.[6]
In its brief, the State concedes "the proposition that a patent cannot be canceled or annulled except through court proceedings instituted for that purpose * * *" However, it contends that the "cancellation" of this patent by the Register of the State Land Office on July 12, 1917, by simply making a notation to this effect in his record, does have some significance for the reason that the patent described "Lot 16" and is therefore of no effect whatever as a patent to "Section 16" in question here.
As stated above, neither the original patent nor any copy thereof is in the record of these proceedings. The certificate of the Louisiana Land Office, set forth in detail above, states that Patent No. 10365 was issued on August 20, 1861 to Charles D. Hamilton (assignee of John Laidlaw) for land described as "Lot No. ______, Section 16, Township 3 North, Range 8 East", containing 128.5 acres. The receipt for payment (pursuant to which the patent was issued) shows that on July 20, 1860, John Laidlaw purchased "Lot 16, Township 3 North, Range 8 East" containing 128.5 acres for the price of $160.62, this receipt bearing Order No. 8922 (LeMeunier Exhibit No. 2). The tract books of the Register of State Land show that "All of Section 16, Township 3 North, Range 8 East", containing 128.5 acres and being school land was purchased by John Laidlaw in July of 1860 as shown by payment Receipt No. 8922, pursuant to which patent No. 10365 *707 was issued. (School Board Exhibit No. 3) Thus, it is seen that although the purchase receipt describes the property as Lot 16, the tract books of the State Land Office and the certificate of issuance of the patent by that office both describe the property as Section 16. In our view, the description of the property patented is clear. Any reasonable title examiner would have concluded from these descriptions that Section 16, Township 3 North, Range 8 East had been patented by the State of Louisiana in 1861.
The school indemnity list by which this property was selected and acquired by the State from the Federal Government describes the land as "Lot or Section 16, Township 3 North, Range 8 East," containing 128.5 acres (Sch. Bd. Exhibit #2, copy of U. S. Tract Book). Of course, the official survey by the United States Government made in 1824 shows this land as irregular Section 16 containing 128.5 acres. It has been recognized in many cases that irregular sections are sometimes described as lots or by the term "Lot or Section", which was the term used in the school indemnity list in this case. See Board of Directors v. New Orleans Land Co., 138 La. 32, 70 So. 27 (1915); Bres v. Louviere, 37 La.Ann. 736 (1885). The certificate of the issuance of the patent in the present case actually does not describe "Lot 16". The description reads "Lot No.______, Section 16" containing 128.5 acres. Under the cited jurisprudence we think it is clear that the description of the land patented is adequate. To hold otherwise would in effect condemn the patents to much of the land in Louisiana.
The next question regarding the validity of the patent is the effect, if any, of the cancellation thereof by the then Register of State Land in 1917. For this purpose the Register filled in the spaces (underlined below) on a printed form (Sch. Bd. Exhibit #5). He states that John Laidlaw had purchased Lot 16, Township 3 North, Range 8 East from the State of Louisiana as shown by patent No. 10365 "which said land was acquired by the State of Louisiana, by Act of Congress, as school land; and whereas, it has been made to appear to me by the written application of the said heirs of John Laidlaw, the holder and owner of said warrant, that the State of Louisiana had no title to said land, because the United States Government had already issued a United States patent therefor, or the State had sold and received pay for said land, prior to the location of said entry certificate and the issuance of said patent."
Of course, the first reason given for the cancellation, i. e., that the United States Government had already issued a United States patent therefor, does not apply. The second reason stated is that the State had sold and received pay for said land prior to the sale and patent to John Laidlaw. There is no evidence that this is true. Furthermore, under the jurisprudence cited above, it is clear that this patent is presumed to have been validly issued and cannot be annulled or set aside except through court proceedings instituted for that purpose. The State has cited no statute or jurisprudence to the contrary. Hence, it is our conclusion that the attempted cancellation of this patent by the Register of State Land in 1917 is of no effect.
The State also argues the patent is invalid because the word "Swamp" is written on the bottom of the certificate of issuance of the patent. The State says this means the land was patented as "swamp land", which could be sold by the State with few formalities,[7] and hence the patent is illegal because the property was actually school land. The patent itself is not in evidence so we do not know the significance of the word "swamp". The private claimants say this merely describes the physical character of the land and may indicate the reason the School Board decided to ask *708 the Register of State Lands to sell it.[8] In any event, under the jurisprudence cited above, the patent is presumed to have been properly issued until annulled in a court proceeding instituted for that purpose.
The final question regarding the patent is the applicability of LSA-R.S. 9:5661 (Act 62 of 1912) which provides that:
"Actions, including those by the State of Louisiana, to annul any patent issued by the state, duly signed by the governor and the register of the state land office, and of record in the state land office, are prescribed by six years, reckoning from the day of the issuance of the patent."
As stated above, neither the original patent nor any copy thereof has been filed in evidence in these proceedings. Hence the evidence does not show whether the patent was "signed by the governor and the register of the state land office." However, it is conceded that a patent was issued. It is always presumed that public officials have properly performed their duties, unless the contrary is shown.[9] Therefore, this patent is presumed to have been validly issued and signed. This presumption continues until the patent is annulled in court proceedings instituted for that purpose. Whether or not the prescription of 6 years would be applicable to such an action is an issue which could arise therein. But, it is not an issue in the present case.
Having concluded that for purposes of these proceedings the patent must be considered valid, the next question is the legality of the tax sale on which the private claimants base their title. As stated above, the records show that after the property was patented in 1861 to Charles D. Hamilton, assignee of John Laidlaw, it was not assessed for taxes until 1896 in the name of John Laidlaw. On May 29, 1897, the property was sold for unpaid taxes for the years 1894, 1895 and 1896 assessed to John Laidlaw. The tax sale purchaser was Mrs. Ida Nock LeMeunier. The State makes no issue of the fact that although the tax deed says taxes for 1894, 1895 and 1896 were due, actually only taxes for the year 1896 were assessed and due. This assessment alone was sufficient to support the sale. The State does contend that the assessment in the year 1896 in the name of Laidlaw is illegal because he was not the owner of the property. It argues the only possible owners were the State of Louisiana or Charles D. Hamilton, in whose name the patent was issued. Of course, the private claimants contend that this defect is cured by the prescription of 5 years set forth in LSA-La.Const. Art. 10, Sec. 11, which reads in pertinent part as follows:
"No sale of property for taxes shall be set aside for any cause, except on proof of payment of the taxes for which the property was sold prior to the date of the sale, unless the proceeding to annul is instituted within six months from service of notice of sale, which notice shall not be served until the time of redemption shall have expired and within five years from the date of the recordation of the tax deed, if no notice is given."
Jurisprudence construing these constitutional provisions has established that assessment in the wrong name and lack of notice to the actual owner are defects cured by the prescription of 5 years. In Choate v. O'Brien, La.App., 163 So.2d 157 (4th Cir. 1964) writ refused 246 La. 578, 165 So.2d 480, it is correctly stated:
"Our jurisprudence recognizes only three causes for which a tax debtor may set *709 aside a sale of property for taxes after the lapse of five years from the date of the registration of the tax deed: (1) prior payment of taxes; (2) continued physical possession by the tax debtor; and (3) no assessment. Mansfield Hardwood Lumber Company v. Butler, 234 La. 322, 99 So.2d 129; Ewald v. Hodges, 239 La. 883, 120 So.2d 465; Staring v. Grace, [La.App.] 97 So.2d 669; Stone v. Kimball's Heirs, 199 La. 240, 5 So.2d 758; Ward v. South Coast Corporation, 198 La. 433, 3 So.2d 689; Close v. Rowan, 171 La. 263, 130 So. 350."
We are not entirely clear whether the State contends this tax sale was void becuase of a prior payment of the 1896 taxes. In any event, the record does not show that the taxes were paid "prior to the date of the sale" as required by the constitutional provisions. The tax sale was on May 29, 1897. The tax deed was recorded on July 7, 1897 and the tax rolls show the taxes paid on July 17, 1897.
Of course, there is no evidence of any continued physical possession by the tax debtor. We conclude the prescription of 5 years is applicable and the tax sale is valid.
The next issue concerns the School Board's alternative plea of the acquisitive prescription of 30 years.[10] The most serious question is whether the State commenced 30 years possession by the "corporal possession of the thing", as required by LSA-C.C. Article 3501.
The property in question is wooded swamp land which overflows every year. It has never been cleared, cultivated or inhabited and is accessible only by logging trails. In an effort to show corporeal possession, the State relies on jurisprudence stating that the nature of corporeal possession required varies with the character of the property. The State cites A.B.A. Exploration Gas & Oil Co., Inc. v. A. Wilbert Sons Lumber & Shingle Co., La.App., 170 So.2d 752 (1st Cir. 1964) where the court correctly stated the law:
"The cases relied upon by appellant as authority for the proposition that the word `enclosure' as used in the jurisprudence relative to acquisition by thirty years prescription means a visible fence or wall are clearly without application to the case at bar.
"(4) It is well established that the term `enclosure' insofar as concerns the issue before the Court, is any separation or natural or artificial mark or boundary giving notice to the public and which fix with certainty the limits of the property intended to be possessed. Thus in Hill v. Richey, 221 La. 402, 59 So.2d 434, we note and cite with approval the following applicable language of our State Supreme Court:
"`What the court means by "enclosures", as that term is used in the numerous cases found in the jurisprudence, is that the land actually, physically, and corporeally possessed by one as owner must be established with certainty, whether by natural or by artificial marks; that is, that they must be sufficient to give definite notice to the public and all the world of the character and extent of the possession, to identify fully the property possessed, and to fix with certainty the *710 boundaries or limits thereof. To say that the term means "enclosed only by a fence or wall" would be giving it a very strict and narrow construction, not justified or supported by the articles of the Code, as we have hereinabove pointed out, and would lead to absurd consequences in some cases.'
"(5,6) Also apropos the instant case is that line of jurisprudence establishing the principle that corporeal possession necessary to support the plea of thirty years acquisitive prescription is determined in each instance by the use to which the land is destined by its nature. What is essential for actual possession varies with the character of the property. Hill v. Richey, supra. In cases of this nature swamp land may be possessed by the cutting of timber and the granting of mineral leases thereon. South Louisiana Land Co. v. Riggs Cypress Co., 119 La. 193, 43 So. 1003; King et al. v. Board of Commissioners for Atchafalaya Basin Levee District, La.App., 148 So.2d 138."
In an attempt to show corporeal possession, the School Board introduced certain copies of resolutions of the School Board and lists of school land from its records as follows: (1) A resolution of the School Board in 1903 requesting the Register of State Lands to sell a list of school indemnity land, including Section 16, Township 3 North, Range 8 East, at issue here; (2) a similar request made in 1909; (3) a list of unsold school lands prepared in 1915 by an abstract company which includes Section 16, Township 3 North, Range 8 East; (4) a similar list of unsold school lands prepared in 1923; (5) a similar list made in 1938; (6) a resolution of the School Board in 1941 authorizing the sale of the merchantable timber from a list of school lands, including the property in question, but there is no timber deed to show that the timber from the property was actually sold pursuant to this resolution in 1941; (7) a resolution of the School Board in 1951 requesting the State Mineral Board to lease the property for mineral development; (8) a resolution of the School Board in 1933 authorizing its president to sign a mineral lease to the Texas Company; (9) a resolution of the School Board in 1964 authorizing Mr. Abner Maxwell to include this Section 16 within a fence around his own property.
The School Board also introduced in evidence: (1) A copy of a mineral lease in 1929 to John Dale, Jr. covering several tracts of land, including the property in dispute; (2) a copy of a mineral lease in 1933 to the Texas Company covering a list of properties, including the land in dispute; (3) a timber sale to Rogers Bros. Kiln & Milling Corporation in 1965 conveying all of the merchantable timber on three sections of school land, including that at issue.
The School Board introduced the testimony of Mrs. Abner Maxwell, widow of the late Mr. Maxwell who died in 1966. She testified they acquired Sections 35 and 36, which adjoin the School Board Section 16 on the East, and also Sections 9 through 15, which are adjacent to the School Board Section 16 on the West. Their property is known as Grand Cut-off Plantation at Shaw, Louisiana. The wooded portion of their land "in the back" adjoins Section 16 which she had for years understood was owned by the School Board. However, she said that the line between their respective properties was in the woods and was not fenced until 1964.
Willy Young, a 53-year-old resident of the Shaw community, testified he had hunted on the School Board property all his life. When Mr. Maxwell bought his plantation in 1930, Willy Young assisted a Mr. Green in surveying the Maxwell land. This was the first knowledge Young had that the School Board owned Section 16. He gave no testimony that the boundary lines of the School Board property were marked in any way at the time of the survey in 1930. As to the timber, he stated that it had been cut within the last year, but he didn't know by whom. Young also testified that there were no roads through the property, except woods *711 roads used for logging and that he had never seen anyone on the property who claimed it and that there were no signs to post it.
Addie Cage, a 59-year-old resident of Shaw, testified that he had also hunted on the property all his life; that it was not fenced until 1964 and that it is subject to overflow every year. The remainder of his testimony was essentially similar to that of Willy Young.
Mr. Lawrence R. Alwood testified that he has a hunting camp on Maxwell's property, and that he has hunted on Section 16 for 25 years. It was he who built the fence for Maxwell in 1964. The purpose of the fence was to keep outsiders from hunting on the Maxwell land and the School Board land. The fence was built to include the School Board Section 16 with Mr. Maxwell's woodland. Mr. Alwood testified that he had always understood Section 16 was School Board land, but he didn't know just where the lines were until he built the fence in 1964, at which time he had to have the lines surveyed. Of course, if it was necessary for Mr. Alwood to have the lines surveyed in 1964, it is apparent that the lines were not visibly marked before that time.
As can be seen from the above discussion of the record, we have very carefully reviewed all of the evidence introduced by the School Board to show corporeal possession. It is apparent that there was no corporeal possession, as this term is defined under the above cited jurisprudence, at least until the fence was built to include the School Board land with the Maxwell property in 1963 or 1964. Up until that time there were no enclosures, fences, marked lines, blazed or painted trees or other natural or artificial marks whatever establishing the boundary lines of the property allegedly possessed by the School Board.
Furthermore, until the time the property was fenced in 1964, there is actually no evidence of any possession by anyone for the School Board. The property was leased for mineral development in 1929 and 1933 but no physical possession of the property under these leases was shown. The first evidence that the timber was ever actually sold and cut was under the timber sale to Rogers Bros. in 1965.
It is our conclusion the School Board has not shown that it commenced a 30-year period of possession, for purposes of acquisitive prescription, by the corporeal possession required by LSA-C.C. Art. 3501. Hence, the School Board has not acquired title by prescription.
Although the equities in this case certainly favor the School Board, who assumed for many years that they owned the property and were probably unaware that the property had been sold for taxes in 1897, there simply is no legal basis on which they have title to the property, so long as the patent is not annulled through court proceedings instituted for that purpose. In the present proceedings, we have no alternative but to hold that the private claimants have proved their title.
LSA-C.C.P. Article 3654 provides in pertinent part that when in a concursus proceeding there is presented to the court the issue of the ownership of funds deposited in the registry of the court and which belong to the owner of the immovable property, or of the real right, the court shall render judgment in favor of the party: "(1) Who would be entitled to the possession of the immovable property or real right in a possessory action, unless the adverse party makes out his title thereto:". In the present case, the School Board has been in corporeal possession of the property for more than a year since the fence was built in 1964 and therefore would be entitled to retain this possession, in a possessory action, LSA-C.C.P. Article 3658, except that the adverse parties have made out their title to the property, based on the tax sale.
*712 There is no dispute that the private claimants listed in the concursus petition are the heirs and assigns of the tax sale purchaser, Mrs. Ida Nock LeMeunier, and that their respective interests are as set forth in the pleadings.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the private claimants recognizing them to be the owners of Section 16, Township 3 North, Range 8 East, Concordia Parish, Louisiana, in the following undivided proportions, to wit: F. Nock LeMeunier, Jr., 7/16ths; Myrtle S. LeMeunier, 7/16ths; Carroll L. Wood, Sr., Emily Belle Wood O'Bannon, Dorothy E. Roden, Adele W. Davis, Carroll L. Wood, III, Harry Eldon Wood, Madeline W. Tonti and John Webster Wood, 2/16ths in the aggregate.
It is further ordered, adjudged and decreed that the funds on deposit in the registry of the court and any future payments of royalty or working interests out of production from the Minter Sand Unit "DD" as established by No. 668 of the Department of Conservation of the State of Louisiana, which order is recorded under Registry No. 90489, Conveyance Book U-8, page 569, and recorded by instrument recorded at Registry No. 98088, Conveyance Book R-9, page 226 of the records of Concordia Parish, Louisiana, are owned in the following proportions, to wit:

F. Nock LeMeunier, Jr. .054687 RI
Mrs. Myrtle S. LeMeunier .054688 RI
Carroll L. Wood, III .000868 RI
Madeline Wood Tonti .000868 RI
John W. Wood .000868 RI
Emily B. Wood O'Bannon .003472 RI
Harry E. Wood .000868 RI
Carroll L. Wood, Sr. .006944 RI
Adele Wood Davis .003472 RI
Dorothy E. Wood Roden .003472 RI
Placid Oil Company .434896 WI
Justiss-Mears Oil Company, Inc. .271810 WI
Cecil F. Heidelberg .081543 WI
Douglas C. Latimer .081544 WI

It is further ordered, adjudged and decreed that the clerk of court of Concordia Parish, Louisiana, be and he is hereby commanded to pay over such funds, less the costs of these proceedings, to such parties in proportion to their respective interests.
It is further ordered, adjudged and decreed that the claims and demands of all other impleaded claimants in this concursus proceeding are rejected.
Reversed and rendered.

On Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] See LSA-C.C.P. Arts. 4651 et seq.
[2] The State Mineral Board and the Register of the State Land Office are also named as defendants because they signed the leases for the school board.
[3] Various Acts of Congress conveyed regular Sections 16 of each township to the states to be held in trust for school purposes, title vesting in the state upon completion of the survey of the township without the necessity of a formal transfer. If there was no regular Section 16, or if portions or all of the regular Section 16 had been conveyed by the Federal Government, the states were permitted to select other land in lieu of sixteenth section land, which did not vest in the state until selected. The latter are called "school indemnity lands". See 27 Tul.Law Rev. 59 at pg. 67; State ex rel. McEnery v. Nichols, Governor, 42 La. Ann. 209, 7 So. 738 (1890).
[4] Act 321 of 1855 provides the procedures to be followed for the sale of public school land. It does not specify whether it applies to regular Section 16 lands or school indemnity lands. It requires an election of the voters within the township and a subsequent sale by the parish treasurer followed by the issuance of a patent. Subsequent statutes made a distinction between the sale of regular Section 16 land and school indemnity land, no election by the voters of the township being required for school indemnity land, LSA-R.S. 41:631 et seq. and 801 et seq.
[5] Actually, there is no evidence to show whether or not there was an election.
[6] In J. W. Frellsen & Co. v. Crandell, 120 La. 712, 45 So. 558 (1908) the court held:

A patent under the great seal of the state vests the legal title in the patentee, segregates the land from the public domain, and deprives the land department of jurisdiction. Hence a subsequent application to enter the same land confers no inceptive rights on the applicant. A patent cannot be revoked or set aside except upon judicial proceedings instituted on behalf of the sovereign. See In re Emblen, 161 U.S. 52, 16 Sup.Ct. 487, 40 L.Ed. 613; Emblen v. Lincoln Land Co., 184 U.S. 660, 22 Sup.Ct. 523, 46 L.Ed. 736; Smith v. Crandall, 118 La. 1052, 43 South. 699; U. S. v. Throckmorton, 98 U.S. [61] 70, 25 L.Ed. 93.
This doctrine is applicable even to a case of a patent issued under an unconstitutional act of Congress. In re Emblen, 161 U.S. [52] 56, 16 Sup.Ct. 487, 40 L.Ed. 613. In Stone v. United States [United States v. Stone], 2 Wall. [525] 535, 17 L.Ed. 765, the court said:
"A patent is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. * * * Patents are sometimes issued unadvisedly or by mistake, when the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially, and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the acts of his predecessor. That is a judicial act, and requires the judgment of a court."
See also O'Brien, et al. v. State Mineral Board, 209 La. 266, 24 So.2d 470 (1945).
[7] See 20 T.La.Re. 67-68.
[8] See LSA-R.S. 41:761 for the present statute on the sale of school lands in a swamp area.
[9] Lemann v. Ascension Parish School Board, 158 La. 81, 103 So. 517; LaFleur v. Roberts, La.App., 157 So.2d 340; Veillon v. Sylvester, La.App., 174 So.2d 189; Board of Directors of Public Schools of Parish of Orleans v. New Orleans Land Co., 138 La. 32, 70 So. 27.
[10] The applicable articles of the Civil Code are as follows:

Art. 3499. The ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith.
Art. 3500. The possession on which this prescription is founded must be continuous and uninterrupted during all the time; it must be public and unequivocal, and under the title of owner.
Art. 3501. The possession necessary for this species of prescription, when it has commenced by the corporal possession of the thing, may, if it has not been interrupted, be preserved by external and public signs, announcing the possessor's intention to preserve the possession of the thing, as the keeping up of roads and levees, the payment of taxes, and other similar acts.